Thank you, Your Honor. May it please the Court, Steve Kim on behalf of the United States. The District Court in this case erroneously suppressed child pornography evidence found during a border search of defendant's laptop computer and electronic storage devices. The District Court held that such devices may not be searched at the border without reasonable suspicion, even though it is undisputed that the contents of every other type of container may properly be subject to suspicionless searches at the border. Indeed, if defendant had just happened to be carrying his child pornography inside his bags in hard copy form, we would not even be here today, because there is no doubt that in that case, the District Court would have upheld a border search of the bags containing the child pornography without any requirement of reasonable suspicion. But because of the sheer fortuity of the storage medium that defendant happened to use, the District Court reached the opposite conclusion in this case. That conclusion, however, flies in the face of a century's worth of precedent affirming the plenary authority of customs officials to search property at the border without any founded suspicion. The type of storage container used, moreover, is not a constitutionally sound basis to depart from the long-settled border search doctrine. Unlawful or harmful materials may just as easily be imported by electronic storage media as they may be imported by conventional closed containers. The government's paramount interest in curtailing and detecting such materials is no less important and no more constitutionally problematic just because computers have become ubiquitous or even indispensable.  Counsel, would you go specifically to Judge Pregerson's, Judge Dean Pregerson's rationale for granting the motion to suppress here? Is it primarily on the notion that to open a computer and actually see the contents on the various screens is offensive within the meaning of our Fourth Amendment jurisprudence, or is it somehow equivalent to a search of the home? What was Judge Pregerson's primary conclusion? And then please address that. The principle, what the District Court did was it got off on the wrong legal foot by applying an improper balancing test that the Supreme Court has expressly discredited in Flores, Montana. In Flores, Montana, or in this Court's prior decision in Molina, Tarazan, which was the case that Judge Pregerson relied on, this Court looked at whether a search was routine, and if it was non-routine, it required reasonable suspicion. And to determine whether a search was non-routine, it compared the intrusiveness of a physical property search to the intrusiveness attendant to invasive physical body searches. And what Judge Pregerson did here was likening a computer search because of the contents saying that it contained private matters, and because it contained a lot of private matters, that it was as close to a body search as he could see it, and therefore using that analysis he determined that it was overly intrusive. But he got off on the wrong legal foot because Flores, Montana forecloses that sort of balancing approach. Taking for a moment that Flores came to a contrary conclusion, we have a recent decision, United States v. Selgin, where the panel applied a balancing test considering the intrusiveness of the test. Doesn't that fly in the face of the Supreme Court's decision? I don't think so, Your Honor, because one of the issues that is not in this appeal is the issue of how a search is executed. We are not disputing that there is always a reasonableness limitation on the manner in which a search is executed. And the issue- You can see that there is or is not. A reasonableness limitation. Okay. But that's not presented here. The only issue that was presented in this case was whether customs officials have the constitutional authority to search without any requirement of reasonable suspicion, not the manner in which they execute the search. So nothing in this case would foreclose any subsequent reasonableness challenges to the execution of a search, nor would any decision in this case conflict with the Selgin decision. If anything, Your Honor, I think Selgin supports the government's position in this case because there was the reading of intimate personal correspondence. And this Court made clear, again, reaffirming the broad authority of customs officials to search private materials. And it made sure, importantly, that it said that, if I could turn my notes here for a moment, that the computer that the review of the documents in the case was, quote, nothing like an intrusive body search or even the dismantling of a car that was at issue in Flores, Montana. I think that directly refutes the linchpin of Judge Preggis' analysis that suggested we should compare a physical body search to the invasive physical – I'm sorry, a property search to the invasive physical body searches that this Court has required a higher level of suspicion for. There are other – the second fundamental problem with the district court's decision, other than the Flores, Montana problem, was that the district court failed to see that the search that was done here was constitutionally no more intrusive than the search of other bags that are properly subject to suspicionless searches at the border. The district court drew a false dichotomy between physical belongings that are unquestionably exposed to suspicionless searches and electronic materials, but there's no reason, no principled reason, why that should make any difference. And finally, Your Honors, the district court here gave short shrift to the government's compelling interest in border security and overstated the nature of the privacy interests involved at the border. If allowed to stand, the district court's rule would undermine the critical mandate of customs officers charged with the daunting task of policing and protecting our borders. For one, it will remove the critical deterrent effect of suspicionless searches, as this Court has already recognized in Cortez-Rocha. Two, because there is no reasonable suspicion requirement for any other container presented at the border, the district court's rule will create an obvious and overwhelming incentive for electronic contraband and other prohibited materials to be imported through computers. Third, the reasonable suspicion requirement is particularly ill-suited for border searches of property because border searches are designed to detect violations that will not give rise to articulable grounds for suspicion in the conventional law enforcement sense. And finally, the district court's rule will lead to incongruous and perverse results. A box of photographs could be searched at the border, but those same photographs on a digital camera could not. A carton of CDs or DVDs being shipped from China could not be inspected at the border, but that same content downloaded onto a computer could not. And a cargo ship full of documents could be searched at the border, but those same documents would be off limits if stored on an electronic storage device. Customs officers simply cannot properly mind the borders of the United States with such incongruous and arbitrary standards. Thank you, counsel. You have plenty of time for rebuttal, so we'll hear from the other side. I hope he's not going to sneak up from the rear with his remaining time there. Would you introduce yourself for the record, please, counsel? My name, Your Honors, is Marilyn Bednarski. I represent Mr. Arnold. I'm the appellee in this case. Before I get to the case law, before I get to the balancing test, I wanted to talk for a minute about how very real this issue is. In coming back from a trip to Italy, it might be typical for a traveler like myself who has a laptop, takes work along. The laptop has files of clients' discovery. The laptop has issues in the case perhaps to identify, research, thoughts about weaknesses of the case, thoughts about the strength of the case. It might have drafts of things, as well as the final pleadings that would become public. But beyond that, the laptop would also have all the e-mail communications, because e-mail is the communication of choice. Perhaps even more than phone calls now would have personal files, Internet searches about concerns, perhaps health concerns. And your point is that this all could be discovered by customs agents and presumably other people's rights might be affected. Is that your point? And that it's an issue that touches upon a broad, broad basis. Okay. Well, why is that any different than if you had gone to Italy with the same materials but in hard copy form in your briefcase and you brought them back, including client-sensitive documents? Certainly they can be discovered. They can be inspected by the customs agents at the border. There's not much doubt about that, is there? One way in which it's different, and I think this is a huge difference, is that the way in which laptops are used is entirely different than a static piece of paper, a piece of paper that has a limited amount of information on it. It has a limited scope and it has a limited nature. A laptop, if you printed out all of its contents, would, a typical laptop, would stretch around the world end-to-end, pieces of paper. The way in which laptops are used is really as a way of communication and a way of, even unlike a phone in which you'd have telephone conversations which basically evaporate into space, they're not recorded. Laptops record things, sometimes with your knowledge, sometimes without, and even cannot be deleted. So you often don't even intend to have things on your laptop that are in fact there. We've learned that from some other cases in which things can be retrieved. Are you just contending that the volume's greater and therefore it's different? Not only that, it's the way in which a laptop is used as a communication device. And the way I see a laptop is, in a way, like a truth serum version of an interview with a person. If you were to talk to a person about their life, it would be edited, it would be tailored in a certain way. If you took a look... You want us, in effect, to equate the contents of a computer to your alimentary canal. Is that what you're saying? To your mind and your heart, is the way I see it. To your mind and your heart. It's much closer to a view into someone's mind and how they think and who they associate with and how they communicate than a piece of paper. But if I'm someone who... A hundred years ago, wouldn't someone have put that, say, in a diary or in letters or things like that? Even a diary or even a letter has a very limited scope. And I would say that it is not a complete view of someone's life like a laptop is. It's so different, not only because of the way in which it's used and the volume, but the nature of how integrated laptops have become in our lives. Simply, something like that didn't exist. But it's part of our bodies, basically? I think it's part of who you are and how you think. It's like taking a piece of yourself. So somebody without a computer is in trouble. Well, I think in our current day lives, there's certainly... The laptop is an essential device in commerce, in law, in students' lives. They're giving laptops to first graders in Nigeria and Africa. Kids here are using them in kindergarten. It's become the way in which we associate and communicate. In a way, I guess my laptop is sort of like the adult version of MySpace or a FacePage. It just is so different. And I disagree with the government in their saying that it's inconsistent with Supreme Court law, our position. I think if you look back in the history of our Supreme Court law, what you'll see is that the test at the border has always been reasonableness. It's hinged in the Fourth Amendment. All searches must be reasonable. If you look at... The test is reasonableness for when to search or the manner of searching? I think the reasonableness test is, as developed in case law, based on manner, scope, and justification. So you think at the border, you have to have reason for searching?  What I think that reasonable test requires is a balancing. And the way I see it is at the border, the justification side of the balancing is often very high. The intrusion or the scope must also be viewed. And sometimes I see an overlap between manner and intrusion. You asked the question of counsel what Judge Pregerson based his decision on and whether or not it was an offensive intrusion. You see language over and over again, not just in the Supreme Court cases, but in the circuit cases on reasonable being hinged in and being based in intrusiveness, in dignity, in privacy. When we look at the Supreme Court cases, we get more help in searches of autos because, of course, in the Supreme Court, they've dealt with the intrusiveness with respect to autos, whether it be a trunk at secondary, whether it be taking apart a gas tank. We also have some guidance from Judge Rehnquist in the opening of mail back in 1977 with Ramsey, where, of course, they wrestled with reasonableness, and he hinged his decision in the fact that there was a statute which required reasonable cause to search first-class mail and in procedures which prevented postal inspectors from actually reading the content. If you go forward to the board. The board are different, though, counsel. It is. And that's why I agree that the justification is higher. But because in this case the intrusion is so much higher, that must also be equated in the measure. Well, counsel, what are you asking for in terms of this Court's review of Judge Pregerson's decision? Is it your contention that laptops are immune from searches at the border? Absolutely not. In fact. Well, then take us through the steps. What rule are you asking for? I'm asking that the rule merely be reasonable suspicion. And in answer to your question. You know, reasonable suspicion is off the table in terms of a border search, is it not? No. It's absolutely not. In other words, you have to have reasonable. I mean, a customs agent at the border has to have reasonable suspicion to open a suitcase? No. But a customs agent has to conduct a search that comports with the Fourth Amendment. That requires a balancing. When it comes to a laptop. Okay, but take it step by step. You're there in the customs bay. The customs officer sees that you have a laptop. Number one, can he look at the laptop? Can he open the laptop? He can turn it on to make sure it's not a bomb or a false container. I agree that's a reasonable intrusion. Okay, we're not talking about security here. We're talking about customs. Right. Some traveler comes in and is in the Bradley Terminal and is entering the country. That customs agent can turn on the laptop to determine if it's a bomb or false container. All right. Is there any case out of any court which holds that? Well, no. I think, frankly, our case is one of first impression. I have not seen a case in which the court has been asked to give authority to border patrol agents in full discretion to search a laptop with no reasonable suspicion. So I think we're wrestling with a new issue. But your premise is that, and I guess this goes back to your earlier colloquy with Judge Smith, and that is that laptops are somehow different. Absolutely. I see. All right. And the reason why. And there's no case in point either that would ever recognize that proposition. No, I think. Otherwise, we probably would have been directed to it. Right. And I think what you have to go back to is the law as it's developed in the Fourth Amendment area, which is founded in balancing the rights, personal rights, and indignity of personal intrusion. You recognize there's case law that already allows customs agents at the border to search in areas where we might have our most intimate belongings.  Briefcases. Purses. Purses on our person, in our pockets. Absolutely. They can search where we might find our most intimate belongings, and they can search where we might find a lot of belongings. That is, if we came in through the border with 50 pieces of luggage, they could search all of them. If we moved from Italy to the United States with all our household belongings, they could search through all of that, couldn't they, at the border? It seems to me it's neither intimacy nor number that can help you here, since the border searches can already search intimate belongings, and they can already search millions of documents. So how does a laptop differ from either of those? Well, there's a couple reasons. In a piece of luggage or in a carry-on bag or purse or an envelope, you might find a personal item. You might find a diary. You might find a letter. You're suggesting the laptop is more likely than anywhere else that they can already search to have our most intimate belongings. Absolutely. Because of the way in which we use them, and not just... And when you say we, you mean a certain number of people. So the exception seems to me to pose risks for older people like me and poor people who come into the country without laptops. You're going to have an exception for high-tech people to get through the border without being searched. I don't see it as an exception. I see it as the balancing is different here because we're faced with a new technology. And I see a laptop as, different from those other items, very, very likely to contain the most intimate, not just intimate thoughts. For instance, for a traveling judge, I would assume that a judge may well electronically have draft opinions, bench memos, things talking about weaknesses or strengths, comments perhaps on personal opinions about things. There are many things that I could imagine people would not want out for public view. I'm not just talking about contraband. I'm talking about what society is prepared to view as confidential and private. Well, I go back to my earlier question. If I, as a traveling judge, were carrying a draft disposition, which is quite common, should I expect somehow that if I were coming back from an overseas trip that I could tell the customs agent, no, you can't look at my briefcase because it has a private draft of an opinion in it? I am saying that with the test I'm suggesting, which is the lowest, most minimal standard, and I'm going to talk about that in a minute, that there is no need for this so-called unfettered discretion that the government wants. They want the most aggressive tool, which is that every agent has full discretion to look completely at the contents of your computer, to read everything. So if you're successful, you'd acknowledge, wouldn't you, that, for example, anybody who wanted to come into the country with child pornography, you would have greatly increased their chances. You'd give them a medium, a particular medium that has a particular exception to border searches, laptops. And it would be difficult, I think, in many cases to figure out how they'd get reasonable suspicion as opposed to just searches. In this case, for example, would they have had reasonable suspicion at the outset? I think this case is an anomaly. I disagree that it would become a free-for-all. I completely disagree with that. I think the history of our case law shows how very easy reasonable suspicion is to acquire, and that that test, which has been the test for intrusive searches, it has been for 20 years. We've been applying this standard with traditional investigative techniques, and it works. But not at the border. We have. We have for body cavities. We have for X-rays. We have, I mean, involuntary X-rays. We have for strip searches. In the 70s, people were so concerned about the importation of drugs, the concern that it was undermining our society was a big concern. But aren't you focusing on the manner of the search, not the right of the government to search? I don't believe so, because I think the level of intrusion is what is key. In the level of intrusion that is hinged in, I think you have to look at society's view, but the level of intrusion that was there that caused the Supreme Court to reject the government's view in the 70s and 80s that they, in order to stop drugs from coming in and destroying our society, just had to have complete discretion. It's, first of all, not necessary. They're seeking the most aggressive tool when there's not a scintilla of evidence to show that it's necessary. Speaking of necessity, then, if you imagine someone coming into the country under your proposed rule with a laptop with child pornography, under what circumstances would reasonable suspicion arise to allow the search of that laptop? Virtually all circumstances. Walking in with a laptop? Virtually every search is going to make, is going to meet that constitutional standard of reasonable suspicion. Look at the cases. Look at what we have. I don't want you to look at the cases right now. What I'd like you to do is suggest a way in which someone who's just coming to, as you said, the Bradley Terminal with a laptop, how would reasonable suspicion begin to arise? Someone notices that a traveler's nervous. Someone notices that a traveler is dressed strangely or is intoxicated. Someone notices that and starts to talk with the traveler about the purpose of the travel. Why were they there? Who were they visiting? Didn't they find that in this very case? Didn't they say that your client was nervous, averting his eyes? Was there reasonable suspicion in this case? There wasn't, but what happened that will, in fact, occur over and over again and will, in fact, turn into reasonable suspicion is that the agents then began to question the traveler, Mr. Arnold. The difference, and what is different in all those cases that are repeatedly before the courts, is how easy reasonable suspicion is to develop. What occurred in our case that was so fundamentally different is that the agent here was someone who essentially was not trained, was someone who had only been there a year, who no referrals to secondary had ever resulted in an arrest. When she tried to articulate her memory of the events that occurred to try to support reasonable suspicion, because, of course, the government's premise at the district court was there was reasonable suspicion, but what happened is none of the reasons were, in fact, founded in reality or objective fact. The problem that the government had in this case was that the facts just weren't there because the agent's recollection was so poor and inconsistent. There were no reports that were prepared timely. There was a group report, but no report of hers. So as a result, when it came to the hearing, she did not have a good recollection, and the recollection she had was constantly contradicted by different things, she would say. And then the importance, I think, of judicial review, and this is key because if you accept the government standard, which is that any agent out there should have no procedures and there would be no judicial review, it would basically be left to the unfettered discretion of any agent out there. If you accept that, then the review that took place here, which is what were the reasons, which was the job of the district court, to view the credibility of the agent. But, counsel, doesn't everybody agree that the reasonableness of the way the search is conducted is an ongoing requirement? Didn't you say that earlier, that that was an ongoing standard? What that means to me and what it means to the government seem to be two completely different things. The government seems to be saying in this case that by virtue simply of the fact that it was at the border, it's reasonable per se. I completely disagree with that. I think it's contrary to Supreme Court law. I think it's contrary to the Constitution. What I'm saying reasonableness requires is you must do a balancing in which you look at justification and scope and manner. And here, even though I agree justification at our borders is an important consideration and is high, I also think our case is so unique because the intrusion into this unique situation, into this unique technology that has indeed become ubiquitous, is great. Thank you, counsel. Your time has expired. Thank you. If the government has a little bit of time to respond. Thank you, Your Honor. I'll make four brief points and then conclude. The first issue that Ms. Bednarski raised was storage capacity, and I won't dwell too long on this. But it's clear that storage capacity cannot be a constitutionally significant reason to treat computers differently. It leads to the absurd rule that the more materials a container may hold, the less constitutional authority customs officials would have to search. That would clearly have unacceptable adverse consequences to border security. The second point I would raise in response to Ms. Bednarski's point about how computers have sort of changed the way we interact with one another and that they're this unprecedented device that we've not seen before. No question computers have changed the way we live. But the salient question is, legally, does that give rise to any constitutionally significant differences? The critical flaw, I think, in Judge Paragus's analysis was the assumption that our physical belongings are somehow less private to us than our informational or electronic information. We can obviously imagine a situation with our prescription medications, religious literature, diary, all kinds of things that we carry in hard copy form, prescription drugs that would show what kind of medical conditions we have, religious literature that would show our beliefs. These things go into our heart and mind insofar as anything else that we hold does go. But there is no actual intrusion into the body. The one exception that this Court and other courts have made for invasive physical body searches is not an apt analogy because we're dealing with the singularly invasive act of penetrating our bodily integrity. And that's an area where courts have recognized that there's a different concern at issue. But when we're dealing with materials in electronic or hard copy form, the constitutional analysis should be the same. Third, on the balancing test, the paradigm that Ms. Bednarski is advocating is the conventional law enforcement paradigm that we use in the interior of the country. Simply put, the border is different. There, in the long line of Supreme Court cases since Montoya, Ramsey, the balance is already struck in a way that emphasizes the government's compelling interests and the substantially diminished privacy interests of travelers. The abiding lesson of Flores, Montana is that we do not recalibrate that balance every time we're faced with a different type of container at the border. Fourthly, we are not seeking in this case, or in any case, unfettered discretion to commit abuse. The sort of parade of horribles that Ms. Bednarski is intimating simply is not existing in this case, and there's no reason to presume that it would come up in any other case. As this court has recognized in Cortez-Rocha, aside from the constitutional limit of reasonableness, there are common-sense, non-constitutional limits. First, the court recognized that customs officers do not waste time on dead-end adventures. To give the court some context for that, on a typical day, a customs officer will process over a million passengers and pedestrians, over 70,000 truck, rail, and sea containers, 300,000 incoming vehicles, over $80 million in fees, duties, and tariffs, and a quarter million incoming international air passengers. They're responsible for 1,900 miles of border with Mexico, 5,000 miles of border with Canada, 95,000 miles of shoreline, and 326 ports of entry. And all this has to be done with about 18,000 customs officers and about 12,000 border patrol agents. The other limit that there is in this case was intimated in Flores, Montana, and Cortez-Rocha, which is that border searches have to keep track of their border searches administratively on computers, which is another way that will curb any potential abuses that might exist. In the end, Your Honor, I will conclude with this remark. The government is not being blind to the realities of the digital age. The technological advances have to factor into both sides of the Fourth Amendment equation. In the same way that computers have revolutionized our lives, they have also presented new law enforcement challenges, and those challenges are no more acute than at the border. In the end, the relevant question is not how are computers different from other containers, because they are unquestionably different in numerous real-world ways. The salient issue is, is there any constitutional significance to those differences? And we respectfully submit that there are none and ask the Court to reverse the district court suppression ruling. If there are no further questions from the panel, I'll submit. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will take its morning recess. Thank you.
judges: O'scannlain, Smith, Mosman